# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 3:14-00161 |
| | ) | **Judge Sharp** |
| ZACHARY HENDRIX | ) | |

## MEMORANDUM

After an evidentiary hearing, the Court denied Defendant Zachary Scott Hendrix's Motion to Suppress (Docket No. 13). In doing so, the Court found, among other things, that (1) canine handler Officer Mark Wilson of the Clarksville Police Department lawfully stopped a Toyota Highlander in which Defendant was a passenger for a broken taillight; (2) the driver and owner of the vehicle, Alex Jarman, who was visibly shaking and gave inconsistent answers to where he was going and what he was doing, voluntarily consented to a search of the vehicle within about eight minutes of the stop; (3) during the interim, (a) Officer Wilson learned that Jarman was on probation for a recent cocaine possession charge, (b) Sergeant David Odell arrived on the scene and spoke with Defendant Hendrix, who appeared nervous and was sweating, and Defendant consented to a search of his persons within six minute of the stop; (4) both officers testified credibly; (5) "under the totality of the circumstances . . . the traffic stop and the subsequent conduct of the officers was reasonable"; (6) the officers "acted diligently without undue delay to confirm their suspicion that criminal activity was afoot"; and (7) Defendant made a "voluntary and knowing waiver of his Miranda rights." (Docket No. 36, Trans. Vol. II at 58-63).

Defendant moves for reconsideration based upon the Supreme Court's decision in Rodriguez v. United States, 135 S.C. 1609 (2015), decided after this Court's ruling, and on "prevailing Sixth

1

Circuit case law," as set forth in cases such as United States v. Urietta, 520 F.3d 569 (6th Cir. 2008). He argues that, in light of that precedent, Officer Wilson had no right to ask Jarman to search the car and, therefore, everything that occurred thereafter is tainted by that initial illegality. This Court is unpersuaded by Defendant's argument.

**I.**

In Rodriguez, the Supreme Court "granted certiorari to resolve a division among lower courts on the question whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff," 135 S.Ct. at 1614, and concluded they could not. Noting that a traffic stop is analogous to a Terry stop under Terry v. Ohio, 392 U.S. 1 (1968), the Court held that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop . . ., and attend to related safety concerns[.]'" Id. (citations omitted). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" Id. In short, "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed," and any prolongation beyond that point, even if *de minimus*, violates the Fourth Amendment.

The notion that a traffic stop may last no longer than that necessary to achieve its purpose is not a new proposition in the Sixth Circuit. As Defendant points out, Urietta and other cases hold that "[t]o detain a motorist any longer than is reasonably necessary to issue a traffic citation, an officer must have a reasonable suspicion that the individual has engaged in more extensive criminal conduct." 520 F.3d at 574; see also, United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002) (same). In fact, the Sixth Circuit has "adopted a bright-line rule that any subsequent prolonging,

2

even *de minimis*, is an unreasonable extension of an otherwise lawful stop." United States v. Stepp, 680 F.3d 651, 661-62 (6th Cir. 2012). Rather, "[o]nce the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot.'" United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999).

What may be new in light of Rodriguez is a potential limitation on extending a "'not yet completed traffic stop,' where the reasonableness standard – in which '*de minimus* extensions' are not unreasonable –governs." United States v. Zuniga, 613 Fed. App'x 501, 502 n.1 (6th Cir. 2015) (quoting Stepp, 680 F.3d at 661-62). This is because the Supreme Court "endorsed [the] Sixth Circuit's] approach precluding even *de minimus* extension after the reason for the stop has concluded, but included language suggesting that this standard may apply regardless of when the questioning occurs." Id.[1] However, even if Rodriquez is read as imposing an additional limitation, that would not perforce require suppression because "'evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.'" Id. (quoting Davis v. United States, 131 S. Ct. 2419, 2429 (2011); see also, United States v, Winters, 782 F.3d 289, 306 (6th Cir. 2015) (citation omitted) (in deciding whether a search is proper, an officer "is entitled to an objective reasonable reliance on existing judicial precedent").

## II.

Defendant insists that Officer Wilson "was unable to state any particularized fact showing a crime other than a broken taillight, and that he had all he needed to successfully complete the

---

[1] The specific language in Rodriquez is as follows: "[A] traffic stop prolonged beyond [the time reasonably required to complete the stop's mission] is unlawful. The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs' – i.e., adds time to – 'the stop.'" 135 S. Ct. at 1616 (citation omitted).

traffic citation before he asked Mr. Jarman to exit his vehicle." (Docket No. 43 at 4). In support, he relies on the following exchanges that occurred during cross-examination at the suppression hearing:

> Q: What specific criminal activity did you suspect that Mr. Jarman was engaged in at the time you asked him to get out of the vehicle?
>
> A: There was no criminal activity. I asked him to get out of the vehicle in an attempt to gain his – to ask him for consent to search and to also identify which brake light it was that was not functioning.
>
> Q: So is it fair to say that you did not have reasonable suspicion at the time you got him out of the vehicle, that he had committed or was about to commit a criminal offense?
>
> A: No, sir.
>
> Q: That's not fair to say?
>
> A: I did not have reasonable suspicion at that point.
>
>     \*        \*        \*
>
> Q: So is it a fair statement to say that at this point you are not pursuing completing the citation for the broken taillight?
>
> A: That's correct.
>
> Q: You are conducting a separate investigation based on the information that you received from dispatch stating that Mr. Jarman was on probation; correct?
>
> A: I did not know for certain until Mr. Jarman confirmed it to me that he was on probation. It was my suspicion that he was due to the recency of his cocaine charge, but that in conjunction with his nervousness is why I proceeded the route I did.
>
>     \*        \*        \*
>
> Q: What offense?
>
> A: I don't know what offense but it was – I believe it's reasonable that due to his nervousness, he was – I believe Mr. Jarman to be in his twenties. With that nervousness and everything else that I had stated, that something else other than a traffic stop is occurring.
>
> Q: So the answer to my question -it's fair to say you didn't have reasonable suspicion any particularized criminal offense that he had committed or was about to commit; correct?
>
> Wilson: That's correct.

4

(Docket No. 59, Trans. at 59-60 & 63).

In the abstract, Defendant's argument may have some superficial appeal. But just as the "'touchstone of the Fourth Amendment is reasonableness,'" which, "in turn, is measured in objective terms by examining the totality of the circumstances," Ohio v. Robinette, 519 U.S. 33, 39 (1996) (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)), so, too, must Officer Wilson's testimony be considered in context. See also City of Los Angeles, Calif. v. Patel, 135 S. Ct. 2443, 2458 (2015) (citation omitted) ("the ultimate touchstone of the Fourth Amendment is 'reasonableness'"); Heien v. No. Carolina, 135 S. Ct. 530, 535 (2014) ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection'").

Officer Wilson credibly testified that when he was passed by a black Toyota Highlander going in the opposite direction, he noticed in his side view mirror that one of the tailights was not working. Accordingly, he turned his vehicle around and initiated a traffic stop, which unquestionably he was entitled to do. See Whren v. United States, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"); United States v. Johnson, 242 F.3d 707, 709 (6th Cir. 2001) (upholding traffic stop for broken taillight under Tenn. Code Ann, § 55-9-402(b)(1) & (c), which provides that "[e]very motor vehicle shall be equipped with two (2) red tail lamps and two (2) red stoplights on the rear of the vehicle" and "shall be in good operational condition").

When Officer Wilson approached the vehicle, he could see that it was occupied by two individuals. Officer Wilson testified that Jarman, the driver, was extremely nervous and made "quick, very jerky movements," while looking for his driver's license and registration. In fact,

5

Jarman continued to search for his registration, even though he then had it in his hand. Officer Wilson further credibly testified that Jarman's actions were such that he deemed it prudent to radio for back-up while he ran a license and warrants check. Again, this was something that the law permitted. See Rodriguez, 135 S. Ct. at 1615 (citation omitted) ("Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop'" and "[t]ypically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance'").

While the background check was in progress, Sergeant Odell arrived on the scene, and he and Officer Wilson discussed the stop. Officer Wilson learned from dispatch that Jarman had multiple traffic citations on his record, and that he had recently been charged with possession of cocaine and drug paraphernalia. This led Officer Wilson to suspect that Jarman might be on probation and he therefore decided to ask Jarman to step out of the vehicle. This, too, was not unlawful. Id. at 1615 (citing Pennsylvania v. Mimms, 434 U.S. 106, 110-11 (1977) for the proposition "that the government's 'legitimate and weighty' interest in officer safety outweighs the 'de minimis' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle").

When Jarman exited the vehicle, Officer Wilson pointed out the taillight that was not working. He also informed Jarman that he was not going to write a ticket, but would be issuing a warning ticket.

Officer Wilson asked Jarman whether he was on probation and, when Jarman responded in the affirmative, asked if he could search his person. Jarman consented. See, United States v.

Beauchamp, 659 F.3d 560, 571 (6th Cir. 2011) (collecting cases) ("While the Fourth Amendment protects citizens against unreasonable searches and seizures, a search of a person is not unreasonable if that person gives free and voluntary consent.").[2]

Officer Wilson asked Jarman about his plans and was informed that he was going to look at an old Oldsmobile Cutlass that he found on the internet, a story that differed from his initial statement that he was going to a friend's house. Officer Wilson then expressed his concerns about the inconsistencies and asked Jarman whether he could search the vehicle for weapons or drugs. Jarman again consented. There was nothing untoward in this exchange, as "[p]olice officers may ask a few questions regarding weapons and criminal activity, regardless of the stop's original purpose." United States v. Noble, 762 F.3d 509, 525 (6th Cir. 2014). In fact, "[t]he Supreme Court has stressed that '[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop,'" and the fact that a passenger is the one who is questioned "does not alter the analysis." United States v. Winters, 782 F.3d 289, 297 (6th Cir. 2015) (citation omitted).

---

[2] The Court notes that the "government bears the burden of proving, through 'clear and positive testimony' that the consent to search was given voluntarily," and that "[v]oluntariness is determined by examining the totality of the circumstances." Id. at 571-72. At the conclusion of the suppression hearing, this Court specifically recognized those principles and stated that "whether "consent is voluntary is determined by the totality of the circumstances, including the defendant's age, intelligence, education, whether they understand the constitutional rights, the length and nature of the detention, and whether the officers used coercion." (Docket No. 36, Trans. at 60). The Court then ruled:
> The Court finds under the totality of the circumstances, that the defendant voluntarily consented to the search of his person, and Mr. Jarman voluntarily consented to the search of the car. The length of the stop prior to that consent was short. There was no coercion that was utilized. There was no suggestion that defendant's age or Mr. Jarman's age or intelligence or education prevented them from voluntarily consenting.

(Id. at 60-61). In his motion to reconsider, Defendant offers nothing which would lead this Court to conclude that its initial determination on the voluntariness of the consents was incorrect.

7

Officer Wilson approached the Highlander and had Defendant step out of the vehicle. This also was not unlawful. Rodriguez, 115 S. Ct. at 1615 (citing Maryland v. Wilson, 519 U.S. 408, 413–415 (1997) for the proposition that "passengers may be required to exit vehicle stopped for traffic violation"). After telling Officer Wilson that his name was "Corey," Defendant, who emitted "the raw odor of marijuana," consented (freely as this Court previously found) to a search of his person.

Officer Wilson then walked canine Leo around the car. Leo alerted on the open front passenger door, next to where defendant had been seated. A search revealed a black and silver handgun under the passenger seat. A further search of Defendant after he was seen "fidgeting" and "tugging at his outer clothing" revealed several "green pills." Still another search of Defendant before he was placed in the back of a squad car revealed a "white rock-like substance."[3]

### III.

This case is not like Rodriguez nor is it "[s]imilar to Urietta" as Defendant argues. (Docket No. 43 at 5).

In Rodriguez, an officer pulled over a Mercury Mountaineer for veering onto the shoulder of the roadway. The driver was asked for his license and registration, and asked to accompany the officer to his cruiser, which the driver refused. After a records check, the officer returned to the vehicle, asked the passenger for his driver's license, inquired as to the pair's itinerary, returned to his patrol car, and completed a records check on the passenger. He then requested backup, wrote out a warning ticket, and returned to the vehicle for a third time. By this point, the officer testified,

---

[3] Ultimately, Defendant was charged in a two count Indictment with (1) being a felon in possession of a firearm and ammunition; and (2) possessing with intent to distribute controlled substance, including crack cocaine and oxycodone.

the occupants "had all their documents back and a copy of the written warning." Rodriguez, 135 S. Ct. at 1613. Nevertheless, and "[a]lthough justification for the traffic stop was 'out of the way,'" the officer asked permission to walk his canine around the vehicle. When that request was refused, the occupants were instructed to wait outside the vehicle until a second unit arrived. Some seven to eight minutes after the warning ticket was issued, a dog alerted to the presence of drugs.

Tellingly, the Supreme Court noted that its precedents, including Arizona v. Johnson, 129 S. Ct. 781 (2009) and Illinois v. Cabales, 125 S. Ct. 834 (2004), recognize "that the Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention." Rodriguez, 135 S. Ct. at 1614. "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop" but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at 1615. The Supreme Court went on to confirm that "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop[.]'" Id. (quoting Cabales, 543 U.S. at 408).

Urietta involved a traffic stop by a sheriff's deputy for several alleged violations. After the deputy obtained the driver's Mexican license, he inquired whether the driver had a passport. The officer then called the El Paso Intelligence Center in an effort to determine defendant's immigration status.

While waiting for the report, the officer completed three citations. He then learned that there was nothing in the system to suggest that defendant had entered the country illegally, or that he had previously been deported, which was "significant because illegal reentry after deportation" was the "only immigration violation" that the deputy was authorized to enforce. Urietta, 520 F.3d at 571-72.

9

Nevertheless, when the deputy returned to defendant's vehicle, he did not give defendant the citations or return his license, but instead asked a series of approximately 40 questions about defendant's immigration status, criminal history, and moving plans. When defendant gave what the deputy viewed as inconsistent answers, defendant was asked to consent to a search of the vehicle. Approximately 30 minutes after the initiation of the traffic stop, deputies conducted a search that ultimately resulted in the discovery of firearms and fraudulent identity papers.

On appeal, there was no question raised as to the propriety of the stop. Rather, the central issue was "whether, at the conclusion of the traffic stop at 2:07 p.m., [the deputy] had a reasonable nonimmigration-related suspicion for the continued investigatory detention of" defendant. Id. at 573-74. While the government argued that there was reasonable suspicion to believe that defendant was transporting drugs, the deputy's own "testimony and actions . . . belie[d] the government's assertion" because not only did deputy's "testimony at the suppression hearing ma[ke] clear that he conducted the entire stop under the mistaken belief that [defendant's] Mexican driver's license was invalid," he "made the decision not to use the trained drug-sniffing dog that was sitting in his patrol car during the course of the entire stop." Id. at 575.

This case is markedly different because, unlike either Rodriguez or Urietta, the very purpose of the traffic stop was not concluded when Officer Wilson received voluntary consent to search. He testified credibly that he was going to write a traffic warning, but Jarman consented shortly after he was told to exit the vehicle so that Officer Wilson could point out the defective light.

To be sure, determining when a traffic stop has been completed, or reasonably should have been completed, can be complicated. Certainly the Court cannot "arbitrarily define the scope of the traffic stop by making a finding of fact that a [warning] ticket usually takes a certain period of time

for an officer to issue." United States v. Torres-Ramos, 536 F.3d 542, 551 (6th Cir. 2008). Nor can it be that the measure of a valid stop is demarked by when a traffic ticket or warning is actually written "[b]ecause a crafty officer, knowing this rule, may simply delay writing a ticket for the initial traffic violation until after she has satisfied herself that all of her hunches were unfounded[.]" United States v. Ellis, 497 F.3d 606, 612 (6th Cir. 2007). And, conversely, it cannot be "that by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation." Rodriguez, 135 S. Ct. at 1616 (2015).

Rather, as with so much under the Fourth Amendment, the issue is reasonableness, with the ultimate question being "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly[.]" United States v. Sharpe, 470 U.S. 675, 686 (1985). The answer to that question "depends on what the police in fact do" – do their actions "'prolong[] – i.e. add[] time to – the stop[?]'" Rodriguez, 135 S.Ct. at 1616. Officer Wilson's actions before receiving a valid consent to search from Jarman did no such thing.

**IV.**

On the basis of the foregoing, Defendant's Motion to Reconsider will be denied. An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

11